## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:

**SECURITIES AND EXCHANGE COMMISSION,**

                                    **Plaintiff,**

**v.**

**IVAN ACEVEDO
and DANE R. ROSEMAN
a/k/a DAYNE R. ROSEMAN,**

                                    **Defendants.**

---

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### I.
### INTRODUCTION

1.      Beginning in November 2010 through December 2017, Ivan Acevedo and Dane R. Roseman (collectively "Defendants") were, in succession, Directors of Investments for Woodbridge Group of Companies, LLC (d/b/a Woodbridge Wealth) ("Woodbridge"). Woodbridge and its then owner and President, Robert H. Shapiro, operated Woodbridge as a massive Ponzi scheme, which, from July 2012 through December 2017, raised at least $1.22 billion from more than 8,400 unsuspecting investors nationwide through fraudulent unregistered securities offerings.  In their positions, Acevedo and, after Acevedo's departure, Roseman, managed Woodbridge's wide-ranging efforts to sell securities to investors while knowing or being severely reckless in not knowing that Woodbridge was engaged in a scheme to defraud and was

making material misrepresentations to investors.  For their efforts, together, Acevedo and Roseman received at least $3.1 million in transaction-based and other compensation.

2.      In their positions, Defendants oversaw Woodbridge's sales department staffed with approximately 30 in-house sales agents, as well as Woodbridge's network of hundreds of external sales agents who solicited investors through a combination of television, radio, and newspaper advertisements, cold calling campaigns, social media, websites, seminars, and in-person presentations.   Defendants were not registered with the Commission as broker-dealers, and Woodbridge's securities were not registered with the Commission and there was no applicable exemption from registration.

3.      Defendants knew, or were severely reckless in not knowing, that Woodbridge's stated business model beginning in 2012—loaning investor funds to third-party borrowers at high interest rates which investors would purportedly receive a percentage of—was a sham.  Defendants knew, or were severely reckless in not knowing, that virtually every "third-party borrower" was, in reality, an entity owned and controlled by Shapiro, which ownership was masked through a series of at least 275 shell Limited Liability Companies all owned and controlled by Shapiro ("Shapiro's LLCs").   Defendants also knew, or were severely reckless in not knowing, that Woodbridge was receiving virtually no interest payments from Shapiro's LLCs, which were using the funds to purchase real estate but were paying no interest on the loans.

4.      Despite this, Defendants prepared and disseminated an avalanche of loan documents and sales and marketing materials giving investors the impression that their investment was safe and secure and that returns would be generated from the interest paid by bona-fide third-party borrowers.  Defendants instructed their entire sales team, both internal and external sales agents, to pattern their sales pitches consistent with this fraudulent premise, and then monitored

2

their telephone calls and e-mail communications to ensure compliance with these directives. Defendants also communicated with Shapiro constantly as to the status of the sales numbers, the performance of their sales team, and the efforts to ensure all sales agents were sticking to the fraudulently premised script.

5.      To keep the fraudulent operation afloat, and because Shapiro's LLCs were paying no interest and Woodbridge's other revenue was minimal, Woodbridge and Shapiro required a continuous infusion of new investor funds and needed existing investors to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal.  Acevedo and Roseman, as Directors of Investments, were tasked with ensuring this revenue raising and rollover occurred, and consistently requested new real estate from Shapiro's inventory to use as a basis to sell Woodbridge's securities.

6.      This Ponzi scheme collapsed on December 4, 2017, when Shapiro caused Woodbridge and its many related companies to file for bankruptcy.  Investors, many of whom were elderly and many of whom withdrew money from their Individual Retirement Accounts to invest in Woodbridge, are likely to suffer substantial losses in the hundreds of millions of dollars.

7.      As a result of the conduct alleged in this Complaint, Defendants violated Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; and Sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)(1)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.      Unless restrained and enjoined, the Defendants are reasonably likely to continue to violate the federal securities laws.  The Commission seeks a permanent injunction, disgorgement of ill-gotten gains plus prejudgment interest and civil money penalties against the Defendants.

## II.
## DEFENDANTS

9.      **Acevedo** is a resident of Chatsworth, California.  From at least November 2010 until his departure from the company in January 2015, Acevedo served as Woodbridge's Director of Investments.  Acevedo is currently employed in investment sales as a co-founder of iAlternatives Portfolio Management, LLC d/b/a iAlternatives, LLC ("iAlternatives") an unregistered private equity company based in Los Angeles, California.  iAlternatives is not currently registered with the Commission as a broker-dealer or investment adviser, but was formerly registered with California as an investment adviser from December 2014 to December 2015.  After departing Woodbridge, Acevedo used iAlternatives as a platform to continue selling Woodbridge's securities, amongst others.  Acevedo has never been registered as or associated with a Commission registered broker-dealer or investment adviser.

10.     **Roseman** is a resident of Encino, California and is currently employed in an undisclosed role at Lionshare Lending, LLC ("Lionshare").  Lionshare is Shapiro's new private equity venture located in Sherman Oaks, California.  From August 2012 to December 31, 2014, Roseman was employed as an Investment Consultant in Woodbridge's internal sales team reporting directly to Acevedo.  At Acevedo's departure, Roseman was promoted to replace him as Woodbridge's Director of Investments where he remained until his termination from Woodbridge in January 2018.  Roseman has never been registered as or associated with a registered broker-dealer or investment adviser.

## III.
## RELATED INDIVIDUAL

11.     **Robert Shapiro** is a resident of Sherman Oaks, California and was Woodbridge's former owner, President, and CEO and maintained operational control over Woodbridge and its

related companies, most of which are the subject of Chapter 11 bankruptcy proceedings. *In re Woodbridge et al.*, Case No. 17-12560 (jointly administered) (Bankr. D. Del. Dec. 4, 2017). On December 20, 2017, the Commission brought an emergency action against Shapiro, Woodbridge, and others seeking an asset freeze, along with injunctive and other relief. *SEC v. Shapiro*, et al. Case No. 1:17-cv-24624 (MGC) (S.D. Fla.). On December 27, 2018, Final Judgment, by consent, was entered against Shapiro enjoining him from violating the federal securities laws as charged, ordering him to pay more than $20 million in disgorgement with prejudgment interest, and imposing a $100 million civil penalty.

## IV.
## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

13. Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. §1391(b)(2).

14. This Court has personal jurisdiction over the Defendants and venue is proper in the Southern District of Florida. Woodbridge raised at least $114 million from approximately 700 investors residing in this district. These investors were solicited primarily by approximately 20 external sales agents located in the Southern District of Florida who Acevedo and Roseman trained, tutored, monitored, provided marketing materials and sales scripts to, and frequently communicated with. Woodbridge paid over $12 million in transaction-based commissions to those external sales agents, all ultimately under the control and supervision of Acevedo and Roseman.

15. In connection with the conduct alleged in the Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate

commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## V.
## FACTUAL ALLEGATIONS

### A.  Woodbridge's Business Model

16.     Woodbridge was originally in the business of selling structured settlements (lottery, annuity and personal injury payments) to investors.  When the structured settlement business started to dissipate, Shapiro approached Acevedo about creating a new product to fill the gap. Shapiro transitioned the company to selling investors that new product, a twelve-to-eighteen month term promissory note security, First Position Commercial Mortgages ("FPCMs" and "FPCM Notes"), with returns generated by the high interest rates Woodbridge would receive by funding hard-money loans (i.e., short-term high interest loans primarily secured by real estate) to third-party borrowers.

17.     Soon thereafter, investor demand exceeded the supply of third-party borrowers willing to pay the high rates Woodbridge needed to charge on the hard-money loans to both pay investor returns and make a profit for the company.  Ultimately, in addition to FPCM Notes, Woodbridge also sold investors seven different private placement fund offerings with five-year terms ("Fund Offerings" and "Fund Investors").

### 1.     FPCM Notes

18.     As represented to investors, Woodbridge would make the payments on the FPCM Notes from the purported revenues Woodbridge received from issuing high interest loans to supposedly bona fide third-party commercial property owners, which would be secured by real estate on which investors would have a first-position lien.  According to Woodbridge, the third-

6

party borrowers could not obtain traditional loans and were willing to pay Woodbridge higher interest rates for short-term financing.

19.     The FPCM Notes, most of which bore an annual interest rate of 5% and matured in twelve (or sometimes up to eighteen) months, were issued by one of seven Woodbridge affiliated entities—all 100% owned and controlled by Shapiro ("Fund Entity" or collectively referenced as "Fund Entities").  Woodbridge represented that a FPCM Note was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives."

20.     Woodbridge represented that the Fund Entity would pool money received from many FPCM Investors and lend those funds to a third-party borrower for one to two years and for up to only 60-70% of the value of the real estate securing the transaction ensuring that the "properties that secure the mortgages are worth considerably more than the loans themselves at closing."

21.     The transaction between the Fund Entity and the purported third-party borrower was documented with a promissory note ("Fund Note") from the borrower to the Fund Entity, secured by a mortgage in favor of the Fund Entity ("Fund Mortgage").  The difference between the interest the Fund Entity was earning on the Fund Note and the interest it was paying to investors was income available to the Fund Entity and Woodbridge that they could use to pay expenses, including operating expenses and sales commissions.

22.     Woodbridge provided FPCM Investors three primary documents: (1) the FPCM Note payable to the investor from the relevant Fund Entity, (2) a collateral assignment to the FPCM Investor of the Fund Note and Fund Mortgage, and (3) an inter-creditor agreement between the FPCM Investors whose funds were being pooled.  Each of these documents created the illusion of a legitimate business.

### 2.      Fund Offerings

23.     At the same time it was soliciting FPCM Investors, Woodbridge also offered to sell investors securities in the Fund Entities ("Fund Offerings") pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors.

24.     Woodbridge attempted to avoid registration of the Fund Offerings with the Commission by purportedly limiting each of the Fund Offerings to accredited investors with a $50,000 minimum subscription.  However, Woodbridge did not take reasonable steps to verify that only accredited investors purchased the securities.  The Fund Offerings provided for a five-year term with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a share of "profits."

25.     In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs.  The Fund Offerings, in effect, were investments into pooled FPCMs.

### 3.      FPCMs Notes and Fund Offerings Are Securities

26.     The loans to the purported third-party borrowers typically ranged in amounts between $1 million and $90 million, depending on the value of the underlying property.

27.     Woodbridge told investors that it conducted due diligence including title search and appraisal on the commercial property and borrower.  The investors had no role in selecting or analyzing the underlying properties.  To the contrary, Shapiro identified the properties underlying the investments, approved every real estate purchase, and selected the amount and type of investments sold.

28.     At the end of a Fund Note's one-year term, the third-party borrower was obligated to repay Woodbridge the principal amount of the Fund Note and, if it defaulted, Woodbridge could foreclose on the Fund Mortgage to recover the amount owed.

29.     The expected profitability of the investments, as well as the promise to pay returns, were derived solely from the efforts of Shapiro and Woodbridge.  Once investors provided their funds to Woodbridge, they had no control over how Shapiro and Woodbridge used their money.

**B.  A Fraud is Born**

30.     From nearly the inception of Woodbridge's FPCM product, Woodbridge's claim that it made high interest rate loans to third-party borrowers was a lie.  In reality, Woodbridge's business model was a sham.  Acevedo and Roseman worked diligently to orchestrate and perpetuate this sham.

31.     While investors were told by Acevedo, Roseman, and their army of both internal and external sales agents that they would be repaid from the high rates of interest Woodbridge was earning on the loans to third-party borrowers, in fact nearly all of the loans were to Shapiro's LLCs, which had no revenue, no bank accounts and never paid any interest on the loans.  Acevedo and Roseman, and the sales agents under their control and tutelage, never disclosed this to investors. Furthermore, given that Shapiro's LLCs were all registered in Delaware, with extremely limited public information available, it was essentially impossible for investors to uncover the true owner of the LLCs.

32.     Investors' funds were used to purchase, in the name of Shapiro's LLCs, almost 200 residential and commercial properties, primarily in Los Angeles, California and Aspen, Colorado. Through the tactics and direction of Acevedo and Roseman, investors were led to believe they had a first-position lien on one of these properties which Woodbridge could foreclose on in the event

the third-party borrower defaulted on the Fund Note.  In fact, default was a certainty, since Shapiro's LLCs never made and had no ability to make any payments on the Fund Notes, and Shapiro never caused Woodbridge to foreclose on the properties owned by Shapiro's LLCs.

33.     Instead of accurately identifying Shapiro's LLCs as the true borrowers, Acevedo, Roseman and the Woodbridge internal and external sales agents under their supervision, only infrequently made passing mention that the underlying properties were sometimes owned by "Woodbridge affiliates."  Woodbridge, Acevedo, and Roseman failed to notify investors that the "Woodbridge affiliates" (i.e. Shapiro's LLCs) would not and could not pay the contractually required interest.

34.     Because Shapiro's LLCs were paying no interest, the Fund Entities had no revenue to make payments on the FPCM Notes and Fund Offerings and instead had to rely, in classic Ponzi-scheme fashion, on the continuous infusion of new investor funds to satisfy obligations to existing investors.  Woodbridge, Acevedo, and Roseman also induced existing investors to rollover their investment into a new FPCM Note upon maturity, thus delaying Shapiro's and Woodbridge's need to come up with cash to repay investors their principal balance.

**C.  The Directors of Investments Man the Boiler-Room**

35.     Acevedo and Roseman, in their respective tenures as Directors of Investments, helped to build the infrastructure that allowed Woodbridge's fraudulent scheme to operate for years.  Among other things, they operated a boiler room where generating sales at all cost became paramount, and effectively ran much of the day-to-day operation of the scheme.

36.     Shapiro entrusted first Acevedo and then Roseman, to carry out the day-to-day operation of selling Woodbridge's securities.  Acevedo and Roseman were responsible, with input from Shapiro, for Woodbridge's entire securities sales operations including oversight of the

company's nationwide network of hundreds of external sales agents and direct supervision of Woodbridge's approximately 30 internal sales agents.  Acevedo and Roseman were engaged with every aspect of Woodbridge's sales department, including hiring, training, supervising and firing employees.

37.     Defendants communicated almost daily with Shapiro.  Shapiro set targets for the amount of money Woodbridge needed to raise, whether it would be from FPCM or Fund Offerings, and the time-frame in which the money needed to be raised.  To expand the sales of the FPCM Notes and Fund Offerings, Acevedo and Roseman, in turn, continuously requested properties from Shapiro to market as collateral.

38.     As Directors of Investments, the Defendants pressured their sales force to meet the sales goals set by Shapiro. This included ridiculing Woodbridge employees for poor performance and threatening them with termination for missing sales targets or deviating from the pre-approved sales script.  Acevedo and Roseman were privy to Shapiro's money-raising goals, while other salespeople under their supervision, internal and external, were not.

39.     During the last few years of the scheme while Roseman was Director of Investments, all sales department emails and phone calls were recorded and reviewed by a quality assurance control team ("QAC") that reported directly to Roseman.  Roseman required strict adherence to the approved script and terminology.

### D.   Defendants' Knowledge of Woodbridge's Fraud and Participation in the Scheme to Defraud Investors

40.     Acevedo and Roseman helped create the false appearance that Woodbridge was a legitimate operation that was using investor funds as marketed, when in reality it was a Ponzi scheme.  Defendants were well-aware that Shapiro's LLCs were the obligors on the Fund Notes and knew, or were severely reckless in not knowing, that Shapiro's LLCs would not be paying

Woodbridge interest as promised.  Yet Acevedo and Roseman still personally solicited investors with sales scripts, marketing materials, including an FPCM Frequently Asked Questions ("FAQ") and loan documents that misrepresented this fact.  They also instructed and required their sales team to do likewise.

41.     Acevedo and Roseman each received regular updates from Shapiro on the purchase and sale prices of the properties owned by Shapiro's LLCs and knew or were reckless in not knowing that Shapiro's LLCs lacked any revenue and therefore paid no interest on their loans. Despite knowing that Woodbridge was, in reality, loaning almost exclusively to Shapiro LLC's, Acevedo and Roseman continued to market Woodbridge's securities with false and misleading marketing materials indicating that loans were being made to bona-fide third-party interest paying borrowers, and reassured investors their investments were safe and secure.  For example, the following FAQs were utilized:



**First Position Commercial Mortgage FAQ**

*9. Who pays me on the first-lien position deals, Woodbridge or the borrower?*

A: Woodbridge will make the payments to you on the terms of the loan documents that you would enter into with Woodbridge. Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your first-lien position documents.

*14. If the borrower does not make their payments to Woodbridge will I be informed?*

A: This question is actually irrelevant, because Woodbridge would continue to make monthly payments to you in order to protect its second-lien, and may or may not inform you of the underlying non-payment. As long as Woodbridge continues to make regular payments to you, there would be no reason to be concerned.

42.     As the sales team began asking more questions, Roseman, behind closed doors, actually began describing the affiliate loans as "incestuous."  In fact, Roseman held a staff meeting in March or April 2017 (eight months before Woodbridge collapsed and petitioned for bankruptcy protection) where he essentially disclosed the fraud to his sales team—specifically explaining the true meaning of the term 'affiliate' and telling his sales team Shapiro was not paying any interest, but that there was "nothing to worry about" because Shapiro would simply pay back the interest from the Fund when the properties were sold.

43.     When a sales agent went to Roseman with concerns that Woodbridge was "using money in a cycle," Roseman explained that because Fund Investors principal was tied up for five years, there was "nothing to worry about."

### E.  Defendants' Material Misrepresentations

#### 1.  Defendants Drafted Materially False Marketing Materials

44.     Acevedo and Roseman helped draft, edit and disseminate offering materials, loan documents and marketing materials to investors which concealed the truth underlying Woodbridge's scheme and misrepresented fundamental facts about the offering, including the actual use of investor funds, the real source of their returns, and the safety and security of their investment.

45.     Both Acevedo and Roseman reviewed and edited the Fund Offerings private placement memoranda and FPCM loan documentation.  Acevedo and Shapiro brainstormed and came up with the initial marketing materials for the FPCM program.  Acevedo and then Roseman reviewed every marketing material that left the sales department.

46.     Acevedo and Roseman also helped create Woodbridge's website and associated key marketing materials that contained a host of materially false and misleading statements about

Woodbridge's business operations and securities offerings.  Acevedo was intimately involved in designing and editing the content of Woodbridge's initial website and associated marketing content.

47.     During Roseman's tenure, he created several highly misleading marketing materials which he required his sales team to use when pitching Woodbridge's securities to prospective investors.  Noteworthy examples of Roseman's false marketing materials include the following:

- **Three Circles Diagram**



In reality, the claimed interest payments from the purported third-party "property owner" (Circle 3) to Woodbridge (Circle 2) did not exist and any interest payments to existing investors were primarily new investor funds.  The three circles description was Roseman's idea and was

developed from his sales pitch to prospective investors.  Roseman drew the three circles on a piece of paper in his office and told marketing to "put this on the website for everyone to see."  Roseman stated that this diagram "is my baby."

- "**Larry Video**"







This video of "Larry the Borrower," was Roseman's idea and created at his request.  It purported to show "Larry" paying monthly interest payments to Woodbridge for his "loan."  This animation, posted on YouTube, was false because it failed to disclose that Shapiro *was* Larry and that Shapiro's LLCs would not be making any interest payments.

- **Pen and Paper Drawing**

During sales calls, Roseman and other sales agents, at his direction, instructed prospective investors to "take out a pen and paper" and draw the three circles diagram.  The document shows (non-existent) interest payments from "Borrowers" and contained the egregiously false claim that Woodbridge was earning "96% annual interest on its FPCMs."

### 2. Defendants Personally Solicited Investors

48.     In addition to managing the entire sales process, Acevedo and Roseman personally solicited hundreds of investors and dozens of external sales agents directly through in-person meetings, group investment seminars, e-mail and telephone conversations relaying on the marketing materials they helped create.

49.     Acevedo and Roseman solicited investors using a host of materially false and misleading statements.  These misrepresentations include: (1) dissemination of the fraudulent FPCM Notes; (2) use and dissemination of false marketing materials; (3) phone pitches to investors and external sales agents seeking to lure additional investors stressing the safety of the investment, the existence of bona-fide third-party borrowers and the certain profitability of the investment; and (4) instructing the sales team to make statements to investors Defendants knew to be untrue, including:

- Woodbridge's loans were to bona-fide third-party borrowers;

- Woodbridge received mortgage payments directly from the third-party borrowers;

- Woodbridge would foreclose on the borrower's property if necessary;

- An investor's monthly interest payment from Woodbridge was a percentage of the interest paid to Woodbridge by a third-party borrower.

All of these misrepresentations, and others, were supported by telephone sales scripts, in-person sales presentations, the aforementioned FAQs, summaries of the key terms of the securities offerings and a sales consultant training manual.

50.     In addition, Acevedo appeared in at least one YouTube video touting Woodbridge's FPCM Notes and claiming that investor funds are "safely invested" while explaining that "Woodbridge receives the mortgage payments directly from the borrower and Woodbridge in turn delivers the loan payments to the investor."  These claims were false and Acevedo knew or was reckless in not knowing that Woodbridge did not receive mortgage payments directly from Shapiro's LLCs and instead the only possible source of funds to make payments to existing investors was the money Woodbridge was raising from new investors.

51.     Roseman's personal solicitation of investors, many of which were recorded by Woodbridge, illustrates the breadth of his misrepresentations.  For example, in phone calls with investors, Roseman told them:

- Woodbridge is earning 80% to 120% on the FPCMs and that each Fund is profitable.

- Woodbridge earns 90% interest on its FPCM investments and claimed some will still say "it's too good to be true."

- "There is no way that you are going to lose money.  The only way you would ever lose money is if we went bankrupt and that is never going to happen."

52.     Despite not being registered with the Commission in any capacity, Acevedo received in excess of $742,000 and Roseman in excess of $2.4 million in transaction-based commissions and other compensation for selling the Woodbridge securities.

### 3. **Defendants' Post-Woodbridge Employment**

53.     In January 2015, after Acevedo left Woodbridge, he formed a own private equity company iAlternatives where he continues to work in investment sales.  Acevedo began operating as an external sales agent for Woodbridge, soliciting his clients for investment into the Fund and FPCM product.  Acevedo claimed his company was a "branch of Woodbridge" but specifically requested "non-affiliated deals", i.e. true third party borrowers, for his iAlternatives clients from Roseman.  Woodbridge paid Acevedo transaction-based commissions for these sales.

54.     Roseman stayed on in his role as Director of Investments for a short time after Woodbridge petitioned for bankruptcy, but he was terminated from his position in January 2018.

55.     After Woodbridge, Roseman joined Shapiro as an undisclosed employee in a new private equity venture, Lionshare Lending, LLC ("Lionshare").  A June 26, 2018 press release stated:

> With a combined 40 years of experience, commercial real estate lender Lionshare Lending proudly announce [sic] hard money lending opportunities through their new website.  Lionshare Lending offers various hard money lending programs specifically designed to fit your needs. Their new website covers all loan programs, provisions, property types, documentation and more.

56.     Notably, while another individual is named in the press release, neither Shapiro nor Roseman are mentioned.  Similarly, there is no mention of either of them on Lionshare's website.

57.     At no point, whether employed by Woodbridge or thereafter, were Acevedo or Roseman registered broker-dealers nor were they associated with Commission registered-broker dealers.  The FPCM Notes and Fund offerings were not registered with the Commission and there was no applicable exemption from registration.

# VI.
## CLAIMS FOR RELIEF

### COUNT I

### VIOLATIONS OF SECTIONS 5(a) AND 5(c) OF THE SECURITIES ACT

58.    The Commission repeats and realleges paragraphs 1 through 57 of its Complaint.

59.    No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities issued by Woodbridge and the Defendants subject to this count as described in this Complaint and no exemption from registration existed with respect to these securities.

60.    From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, directly and indirectly:

(a)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

(b)    carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

(c)    made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

61.    By reason of the foregoing the Defendants violated and, unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## COUNT II

### VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT

62.     The Commission repeats and realleges Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

63.     From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud.

64.     By reason of the foregoing, the Defendants, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT III

### VIOLATIONS OF SECTION 17(a)(2) OF THE SECURITIES ACT

65.     The Commission repeats and realleges Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

66.     From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

67.     By reason of the foregoing, the Defendants, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT IV

### VIOLATIONS OF SECTION 17(a)(3) OF THE SECURITIES ACT

68.     The Commission repeats and realleges Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

69.     From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce and by the use of the mails, directly or indirectly negligently engaged in transactions, practices and courses of business which have operated, are now operating or will operate as a fraud or deceit upon the purchasers.

70.     By reason of the foregoing, the Defendants, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

### VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(a) OF THE EXCHANGE ACT

71.     The Commission repeats and realleges Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

72.     From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly employed devices, schemes or artifices to defraud.

73.     By reason of the foregoing, the Defendants, directly and indirectly, have violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a), 17 C.F.R. § 240.10b-5(a), thereunder.

**COUNT VI**

**VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(b) OF THE EXCHANGE ACT**

74.     The Commission repeats and realleges Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

75.     From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities, knowingly or recklessly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     By reason of the foregoing, the Defendants, directly and indirectly violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b), thereunder.

**COUNT VII**

**VIOLATIONS OF SECTION 10(b) AND RULE 10b-5(c) OF THE EXCHANGE ACT**

77.     The Commission repeats and realleges Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

78.     From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, directly and indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails in connection with the purchase or sale of securities,

22

knowingly or recklessly engaged in acts, practices and courses of business which operated as a fraud upon the purchasers of such securities.

79.     By reason of the foregoing, the Defendants, directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(c), 17 C.F.R. § 240.10b-5(c), thereunder.

## COUNT VIII

### VIOLATIONS OF SECTION 15(a)(1) OF THE EXCHANGE ACT

80.     The Commission repeats and realleges Paragraphs 1 through 57 of this Complaint as if fully set forth herein.

81.     From in or about July 2012 through at least December 4, 2017, the Defendants, Acevedo and Roseman, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while they were not registered with the Commission as a broker or dealer or when they were not associated with an entity registered with the Commission as a broker-dealer in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

82.     By reason of the foregoing, the Defendants, directly and indirectly have violated, and unless enjoined, are reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

### A.
### Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining the Defendants from violating Sections 5(a) and 5(c) of the Securities Act; Section 17(a) of the Securities Act; Section 10b(5) of the Exchange Act and Rule 10b-5 thereunder; and Section 15(a)(1) of the Exchange Act.

### B.
### Disgorgement and Prejudgment Interest

Issue an Order directing the Defendants to disgorge all ill-gotten gains or proceeds received within the applicable statute of limitations, with prejudgment interest thereon, resulting from the acts and/or courses of conduct complained of herein,.

### C.
### Civil Money Penalties

Issue an Order directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act and Section 21(d) of the Exchange Act.

### D.
### Further Relief

Grant such other and further relief as may be necessary and appropriate.

### E.
### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## VII.
## <u>DEMAND FOR JURY TRIAL</u>

The Commission hereby demands a trial by jury on any and all issues in this action so triable.

Dated:  April 11, 2019.

Respectfully submitted,

By:  <u>/s/ *Russell Koonin & Christine Nestor*</u>
**Russell Koonin & Christine Nestor**
Senior Trial Counsel
kooninr@sec.gov; nestorc@sec.gov
FL Bar No.: 474479; FL Bar No. 597211
Telephone: (305) 982-6385; (305) 982-6367

**Scott Lowry**
Senior Counsel
lowrys@sec.gov
Special Bar ID # A5502400
Telephone: (305) 982-6387

Attorneys for Plaintiff
**Securities and Exchange Commission**
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300
Facsimile:  (305) 536-4154